# In the United States Court of Federal Claims

No. 24-1194
(Filed: 26 August 2026)

| | |
|---|---|
| ************************************* | |
| BIOTECHINNOVA, LLC, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |
| ************************************* | |

*Rebecca Rhew*, Rhew Legal Group, P.A., of West Palm Beach, FL, for plaintiff.

*Catherine M. Yang*, Trial Attorney, with whom were *Eric P. Bruskin*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, and *Brett A. Shumate*, Assistant Attorney General, Civil Division, U.S. Department of Justice, all of Washington, DC, for the government.

## OPINION AND ORDER

**HOLTE, Judge.**

Plaintiff BiotechInnova, LLC, filed this lawsuit against the United States for wrongful payment to a third party following an informal solicitation for one million COVID masks that resulted in a subsequent rush for financing, an assignment, rejected masks, and finally replacement products. Plaintiff claims the prime contractor, Wright Construction Group, assigned the contract proceeds to plaintiff in return for plaintiff's masks, but the government nonetheless paid Wright after plaintiff's masks were rejected and replaced. Plaintiff also levies claims against Wright for breach of contract and breach of assignment of contract for receiving payment notwithstanding the assignment. After six months of extensions—and opposition to plaintiff's motion to amend the complaint for untimeliness—the government filed a combined Motion to Dismiss and Motion for Summary Judgment. For the reasons below, the Court grants-in-part and denies-in-part the government's combined motion.

## I. Background

### A. Factual Background

In the midst of the COVID-19 pandemic, the Federal Bureau of Prisons ("BOP") awarded Wright Construction Group ("Wright") a contract for 1,000,000 N95 Masks to be distributed

among the BOP Regional Offices for $3,990,000. *See* Am. Compl. ¶¶ 8, 10, ECF No. 26. The government emphasized to Wright the need for such masks to be NIOSH-approved N95 masks. *See* Gov't's Mot. to Dismiss, App'x ("Gov't's App'x") at 305–06 (Solicitation Email), ECF No. 29-1. Wright originally offered 3M-brand masks to the government, but due to the heightened demand for masks during the COVID-19 pandemic, Wright encountered delays and could not fulfill its obligation to the BOP. *See* Am. Compl. ¶¶ 9, 12. On 26 June 2020, Wright proposed an "alternative mask[]" from plaintiff, BiotechInnova, LLC ("Biotech" or "plaintiff"). *See id.* ¶¶ 14–15. The BOP agreed to the alternative, but when the Biotech masks were delivered in late July 2020, the BOP realized the alternative masks were not NIOSH approved. *See* Am. Compl. ¶ 16, 40–43; Gov't's App'x at 41 (5 Aug. 2020 email from Contracting Officer, LaShundra Thomas, to the president of Wright, Bernard Wright). As a result, the government did not accept the Biotech masks and terminated the contract for convenience, effective 5 August 2020. *See* Am. Compl. ¶ 43; Gov't's App'x at 41 (5 Aug. 2020 Email from Contracting Officer to Mr. Wright). After reviewing a sample of proposed alternative masks from Kimberly Clark, the BOP agreed to accept those masks and executed a contract modification on November 10, 2020. *See* Am. Compl. ¶¶ 45–51; Gov't's App'x at 48–57 (22 Oct. 2020 – 10 Nov. 2020 email correspondence between Contracting Officer and Mr. Wright). Wright then collected the unwanted Biotech masks and replaced them with the Kimberly Clark masks, as requested in the contract modification, and was then paid in full by the BOP. *See* Am. Compl. ¶¶ 52; Gov't's App'x at 48–57 (22 Oct. 2020 – 10 Nov. 2020 email correspondence between Contracting Officer and Mr. Wright).

### B. Procedural History

On 5 August 2024, plaintiff filed its first complaint, alleging "breach of contract, breach of good faith, . . . violations of FAR regulations, and . . . civil conspiracy concerning the purchase and sale of N95 masks during the COVID pandemic under Award Contract number 15BFA020PVNP10766." Compl. ¶ 1, ECF No. 1. The government requested multiple extensions to respond to the Complaint, totaling about six months—all of which the Court granted. *See* 11 Oct. 2024 Order, ECF No. 6; 20 Dec. 2025 Order, ECF No. 8; 24 Jan. 2025 Non-PDF Order.

On 1 April 2025, the government filed its first Motion to Dismiss, requesting the Court dismiss plaintiff's complaint "for lack of subject matter jurisdiction or, in the alternative, failure to state a claim." *See* Gov't's Mot. to Dismiss at 1, ECF No. 12. On 28 April 2025, plaintiff filed a Consent Motion for Extension of Time, which the Court granted on 29 April 2025. *See* Pl.'s Consent Mot. for Extension of Time, ECF No. 13; 29 Apr. 2026 Non-PDF Order. On 27 May 2025, plaintiff filed a Motion for Leave to File First Amended Complaint and to Amend Case Caption, to properly set forth its claims against the government and to add Wright as a defendant. *See* Pl.'s First Mot. to Am. Pleadings, ECF No. 14. Plaintiff also filed its Response to the government's first Motion to Dismiss on 27 May 2025. *See* Pl.'s Opposition to Gov't's Mot. to Dismiss, ECF No. 15. On 10 June 2025 the government filed its Reply. *See* Gov't's Reply in Support of Gov't's Mot. to Dismiss, ECF No. 16. On 10 June 2025 the government filed its Opposition to Plaintiff's Motion to Amend. *See* Gov't's Resp. to Pl.'s First Mot. to Am. Pleadings, ECF No. 17. On 17 June 2025 plaintiff moved for three additional days to file a reply in support of its Motion to amend its complaint, which the Court granted on 17 June 2025. *See*

Pl.'s Mot. for Extension of Time to File Reply, ECF No. 18; 17 June 2025 Non-PDF Order. On 20 July 2025 plaintiff filed its Reply in Support of its Motion for Leave to File First Amended Complaint and to Amend Case Caption. *See* Pl.'s Reply in Support of First Mot. to Am. Pleadings, ECF No. 19.

The Court held a status conference on 6 August 2025 to discuss the amendment process for adding Wright as a defendant. *See* 2 July 2026 Status Conference Order, ECF No. 22. On 22 September 2025, the Court granted plaintiff's Motion for Leave to File First Amended Complaint and found as moot the government's first Motion to Dismiss. *See* 22 Sep. 2025 Order, ECF No. 25; *see also* 8 Jan. 2026 Order (clarifying Wright would not be added to the case caption because "no provision in the Rules . . . permits a motion requesting the Court to issue a summons to a private entity"), ECF No. 38.

On 14 October 2025, the government filed a combined Motion to Dismiss and Motion for Summary Judgment. *See* Gov't's Mot. to Dismiss pursuant to Rule 12(b)(1), Mot. for Summary Judgment ("Gov't's Mot."), ECF No. 29. Plaintiff filed a response on 12 November 2025, *see* Pl.'s Resp., ECF No. 30, and the government filed its reply on 24 November 2025, *see* Gov't's Reply, ECF No. 34. The Court heard oral argument on 3 March 2026 in Fort Lauderdale, Florida. *See* 16 Jan. 2026 Scheduling Order, ECF No. 39.

## II. Parties' Arguments

### A. The Government's Argument the Court Lacks Subject Matter Jurisdiction Over Counts III & IV Against Wright because Wright is a Private Entity

In its combined motion to dismiss and motion for summary judgment, the government first argues the Court does not have jurisdiction over plaintiff's breach of contract claims against Wright. *See* Gov't's Mot. at 10. The government states this court "consistently dismisses claims brought by a plaintiff against private parties." *Id.* (citations omitted). Recognizing Wright is a private business, and "[t]he award of a federal contract to Wright does not transform it into a federal entity," the government argues this Court lacks jurisdiction over Counts III and IV, both of "which are identical to the claims Biotech is pursuing against Wright in Florida state court." *Id.* at 11 (citation omitted). In response, plaintiff argues the government "misstates" the Court's jurisdiction and "[t]he Court of Federal Claims has jurisdiction over disputes involving both the Government and its contractors, including disputes concerning termination and performance of contracts governed by the Contract Disputes Act." Pl.'s Resp. at 28.

### B. The Government's Argument the Court Lacks Subject Matter Jurisdiction Over Counts I & II Against the United States Because Plaintiff Cannot Establish a Valid Assignment Under the Contract

The government next argues it "identified at least five independent ways in which Biotech did not comply with the requirements in the Anti-Assignment Act and the FAR." Gov't's Reply at 4–5. The government then addresses the question of "whether Biotech has 'clearly shown' that BOP waived the requirements of the Act and assented to a noncomplying assignment." *Id.* at 6 (citation omitted). The government argues "there is no 'one particular act'

that 'constitut[es] recognition' of an alleged assignment, and notice and acknowledgment of an assignment 'is *not* enough to recognize the assignment.'" *Id.* (citations omitted) (government's emphasis). Plaintiff argues the Assignment of Claims Act "implicitly allows for government waiver by not declaring such assignments 'null and void' but instead specifying conditions under which assignments may be valid – including the exception . . . for assignments to financing institutions, thus indicating that the USA retains discretion to recognize certain assignments." Pl.'s Resp. at 16 (citations omitted). Plaintiff argues the government's receipt of notice of assignment and its acknowledgment of the notice is sufficient for the Court to find the government recognized the assignment. *See id.* at 17–24.

### C. The Government's Argument the Court Should Grant Summary Judgment Because, Even if a Valid Assignment Existed, Plaintiff Did Not Perform Under the Contract

The government argues, if the Court has jurisdiction over plaintiff's claims, the Court should grant summary judgment as an alternative to dismissing the suit because contract performance was not triggered since Biotech's masks were noncompliant and were ultimately rejected by the BOP. *See* Gov't's Mot. at 11, 17. The government lists the following facts and urges that none of them are in dispute: "the BOP contract required Wright to provide masks that were 'NIOSH approved;'" the BOP Contracting Officer, LaShundra Thomas, "repeatedly reminded Wright of the contract's requirement for NIOSH approved masks;" "when Wright offered Biotech's masks to BOP as an alternative to the 3M masks specified in the contract award, Ms. Thomas responded: 'I still need the masks to be NIOSH approved;'" and "when the Biotech masks were delivered, BOP found upon inspection that they were *not* NIOSH approved, did not accept them, terminated the contract effective August 5, 2020, and arranged for the return of the Biotech masks." *Id.* at 17 (citations omitted) (emphasis in original). According to the government, "[t]hese undisputed facts leave Biotech to allege that even though its masks were non-compliant under the Government contract and thus rejected by BOP, it is nevertheless entitled to contract payment because Wright later provided NIOSH-approved masks that Wright procured from a *different subcontractor*." *Id.* at 19 (emphasis in original).

In response, plaintiff argues it did not need to perform to receive the payment under the Assignment of Claims Act and the government, having recognized the assignment of contract proceeds to plaintiff, should have paid plaintiff any amounts it paid to Wright under the Contract. *See* Pl.'s Resp. at 24. Plaintiff argues its performance was not necessary to receive payment under the Assignment of Claims Act because "[o]nce the prime contractor performs, the assignee stands in the prime contractor's shoes and is entitled to recover from the Government." *Id.* at 24. Plaintiff asserts "[i]t is the government's duty . . . to ensure assignees and [] subcontractors are properly paid," and, once an assignment is made, the government "can no longer discharge its payment obligation . . . by paying the contractor" and not the assignee. *Id.* at 25–26 (citation omitted). Plaintiff therefore argues, because Wright ultimately performed and was paid under the contract, plaintiff is entitled to all contract proceeds erroneously paid to Wright. *See id.* at 26.

## III. Applicable Law

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Rule 12(b)(1)

"Subject matter jurisdiction is a threshold issue that must be determined at the outset of a case." *King v. United States*, 81 Fed. Cl. 766, 768 (2008) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)). "If a Rule 12(b)(1) motion simply challenges the court's subject matter jurisdiction based on the sufficiency of the pleading's allegations—that is, the movant presents a 'facial' attack on the pleading—then those allegations are taken as true and construed in a light most favorable to the complainant." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (citations omitted). However, "[i]f the Rule 12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction, . . . the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction. In such a case, the allegations in the complaint are not controlling, and only uncontroverted factual allegations are accepted as true for purposes of the motion. All other facts underlying the controverted jurisdictional allegations are in dispute and are subject to fact-finding by the district court." *Id.* at 1583–84. In order to "establish[] the predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but [instead] may review evidence extrinsic to the pleadings, including affidavits and deposition testimony." *Id.* at 1584 (citations omitted). Once a movant challenges the factual basis for the court's subject-matter jurisdiction, "the party asserting jurisdiction" "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) (citations omitted).

### B. Motion for Summary Judgment Under Rule 56

"The court shall grant [a motion for] summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) of the Rules of the Court of Federal Claims ("RCFC"). A court shall not grant summary judgment if "the dispute about a material fact is 'genuine.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). A factual dispute is considered material and genuine if the "evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Id.* "In determining whether there is a genuine issue of material fact, the trial court must assume that the evidence presented by the non-movant is credible and draw all justifiable inferences therefrom in the non-movant's favor." *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed. Cir. 2001) (citing *Anderson*, 477 U.S. at 255). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "Contract interpretation is a matter of law and thus is amenable to decision on summary judgment." *Gov't Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988) (citation omitted); *see, e.g.*, *NVT Techs. Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("The interpretation of a contract or solicitation is a question of law" (citation omitted)).

The party seeking summary judgment bears the burden of establishing the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When the moving party has met this burden, the burden shifts to the non-movant who must present sufficient evidence to show a dispute over a material fact allowing a reasonable

factfinder to rule in its favor. *See Anderson*, 477 U.S. at 256–57. The evidence does not need to be admissible, but mere denials, conclusory statements, or evidence not significantly probative will not defeat summary judgment. *See Celotex*, 477 U.S. at 322–24.

## IV. Recitation of Disputed and Undisputed Facts

The Court begins with a recitation of the undisputed facts of this case, followed by a description of facts in dispute which were clarified at oral argument.

### A. Undisputed Facts in Plaintiff's Complaint and Clarified by the Parties as Undisputed

Given the global nature of the COVID-19 pandemic, the demand for medical masks quickly outpaced supply, and mask manufacturers struggled to meet the sudden spike in demand. *See, e.g.*, Pl.'s Resp., App'x ("Pl.'s App'x") at 51 (26 June 2020 email from Mr. Wright to Contracting Officer) (noting 3M's mask manufacturing was in "disarray"), ECF No. 31. The solicitation at the center of this case was a 26 May 2020 email from the Contracting Officer, stating "The Bureau of Prisons is in need of NIOSH N95 masks COVID-19 supplies and will need to be delivered to several locations ASAP. Please provide a quote ASAP today . . . . We would like to try to award today, if not by tomorrow." Gov't's App'x at 305–06 (Solicitation Email). On the same email chain, the Contracting Officer followed up the same day to request a "one page quote with an actual delivery date." *Id.* at 305. Neither email included a solicitation number, noted any applicable Federal Acquisition Regulation ("FAR") provisions, nor requested any procedures more formal than an emailed one-page quote. *See id.* at 305–06. The next day, the government awarded contract number 15BFA020PVNP10766 ("Contract No. 0766") to Wright "[t]o provide 1,000,000 N95 Masks" for a "Total Award Amount" of "$3,990,000.00." *See* Gov't's App'x at 1–2 (Standard Form 1449 contract award to Wright) (signed by both Mr. Wright and the Contracting Officer on 27 May 2020). The contract form did not include a solicitation number, requisition number, order number, date of solicitation, any contact for solicitation information, or the method of solicitation—all of these boxes on the contract form were left blank. *See id.* The Schedule of Supplies/Services attached to the form contract specified "COVID-19 Supplies - - N95 Masks (1860 TDS)," which corresponds to a technical data sheet for 3M brand masks attached to the contract. *See* Gov't's App'x at 4 (Schedule of Supplies), 24 (3M Technical Data Sheet). Nowhere in the contract does it specifically require the supplied masks to be NIOSH-approved. *See generally* Gov't's App'x at 1–18.

On 26 June 2020, Bernard Wright, President at Wright, emailed the Contracting Officer and stated "the 3M product is in disarray" and "3M would not provide any product until late September at the earliest." Pl.'s App'x at 51 (26 June 2026 email exchange from Mr. Wright to Contracting Officer). Mr. Wright suggested an alternative mask that "exceeds the 3M product and has better testing" and attached a 20-page pamphlet for Biotech's N95 mask. *Id.*; *see also id.* at 52–71 (Biotech N95 pamphlet). The Contracting Officer responded she "still needed the masks to be NIOSH approved" and she did not see "that on the pamphlet." *Id.* at 50–51 (26 June 2020 email from Contracting Officer to Mr. Wright). Wright sent the following reply:

> Pages 14-20 are the testing for NIOSH and all test were met and approved from Nelson Labs for NIOSH. In addition, the FDA has a higher authority than NIOSH and has designated this mask as "FDA Cleared for Surgical Use and Operation Room Environments". This is the highest approval you can achieve through the FDA for the criteria within the CDC.

*Id.* at 50 (26 June 2020 email from Mr. Wright to Contracting Officer). Based on this response, the Contracting Officer asked Mr. Wright to "[p]lease move forward with this and provide shipping dates ASAP." *Id.* (26 June 2020 email from Contracting Officer to Mr. Wright).

The same day, 26 June 2020, Wright signed the first of several agreements with Biotech to supply Biotech masks to the government. *See* Pl.'s App'x at 72 (26 June 2020 Product Purchase Agreement), 83 (signature page). In the 26 June agreement, Biotech agreed to supply 1 million Biotech masks to Wright for $800,000, which was to be placed in escrow before Biotech would initiate production of the masks. *See id.* at 75. The agreement also stipulated "delivery of goods is non-cancellable and [Wright] must accept delivery of goods once BiotechInnova begins manufacturing." *Id.* at 74.

On 6 July 2020, Wright and Biotech signed another agreement in which Biotech would supply masks to Wright for delivery to the government, and Wright would assign payment from the government to Biotech through one of two methods: (1) if the government required a full assignment of the $3 Million to Biotech, Biotech would keep $2.5 Million but return $500,000 to Wright; or (2) if the government allowed payment to two different parties, the government would pay Wright $500,000 directly and pay Biotech $2.5 Million directly. *See* Pl.'s App'x at 193–94 (6 July 2020 Purchase Agreement), 198 (signature page). Wright and Biotech then signed another agreement on 9 July 2020 to clarify Wright's right to receive the masks directly from the Biotech's manufacturer, and to reiterate the assignment of payment to Biotech through one of the two methods outlined in the 6 July Product Purchase Agreement. *See* Pl.'s App'x at 228 (9 July 2020 First Amendment to Product Purchase Agreement), 229 (signature page).

To effectuate the assignment of payment to Biotech, Wright emailed a letter to the Contracting Officer on 9 July 2020 entitled "Notice and Acknowledgment of Assignment," stating Wright was assigning to Biotech the right to receive $2.5 Million in proceeds from the contract, and requesting the government acknowledge its receipt of the letter and its assent to comply with the assignment. *See* Pl.'s App'x at 199 (Notice and Acknowledgement of Assignment), 246 (9 July 2020 email from Mr. Wright to Contracting Officer). The Contracting Officer responded and asked Wright to specify in the letter what specific amounts of the total $3 Million payout would go to whom. *See id.* at 243 (9 July 2020 emails from Contracting Officer to Mr. Wright). Wright sent a revised letter, which the Contracting Officer signed the following day. *See id.* at 200 (Notice and Acknowledgement of Assignment, signature page), 241–42 (9 July 2020 – 10 July 2020 email correspondence between Contracting Officer and Mr. Wright). The letter also included, as exhibits, a copy of the original contract between Wright and the government and a copy of the assignment agreement between Wright and Biotech. *See id.* at 202–34.

Plaintiff delivered all masks to the government's specified locations by 22 July 2020. *See* Pl.'s App'x at 305–06 (12 Aug. 2020 Letter from Wright to Contracting Officer). After receiving the masks, the government inspected the masks and, on 5 August 2020, the Contracting Officer emailed Mr. Wright informing him the masks "were, in fact, not NIOSH approved," so she would be cancelling the contract. *See* Gov't's App'x at 41 (5 Aug. 2020 email from Contracting Officer to Mr. Wright). On 12 August 2020, Wright submitted formal claims to the government, pursuant to FAR 52.202-4(d) and the Contract Disputes Act ("CDA"), seeking payment on the contract. *See* Pl.'s App'x at 300–312 (12 Aug. 2020 Wright CDA Claim). The Contracting Officer issued her final decision rejecting the Biotech masks on 9 October 2020. *See* Pl.'s App'x at 804 (Thomas Deposition, Exhibit List), 857 (Thomas Deposition).

In October 2020, the Contracting Officer contacted Wright, stating the BOP would be willing to accept another alternative, Kimberly Clark masks, but advised "in no way is BOP agreeing to accept these [Kimberly Clark] masks until a written settlement has been drafted and signed by all parties." *See* Pl.'s App'x at 588–90 (20 Oct. 2020 – 26 Oct. 2020 email correspondence between Contracting Officer and Mr. Wright). Nevertheless, on 10 November 2020, without any settlement involving Biotech, the government sent Wright a contract modification to the (at this point still terminated) Contract No. 0766, replacing Biotech with Kimberly Clark. *Compare* Pl.'s App'x at 591–616 (10 Nov. 2020 Modification to Contract No. 0766, Modification No. P00001), *with id.* at 499 (5 Aug. 2020 Termination of Contract No. 0766, Modification No. P00001). On 7 January 2021, after delivering the Kimberly Clark masks (but without payment), Wright filed another claim. *See* Pl.'s App'x at 710–11 (7 Jan. 2021 email correspondence between Contracting Officer and Mr. Wright). On 20 January 2021, however, Wright confirmed it had been fully paid under Contract No. 0766. *See* Pl.'s App'x at 707 (20 Jan. 2021 email from Wright to Contracting Officer). On 26 January 2021, the Contracting Officer emailed Wright and Wright's counsel to confirm the 5 August 2020 Termination and 9 October 2020 Final Decision had both been rescinded. *See* Pl.'s App'x at 712 (26 Jan. 2021 email from Contracting Officer to Mr. Wright). Plaintiff's masks were ultimately returned, but plaintiff was never paid. *See* Pl.'s App'x at 752 (Wright Deposition).

### B. Disputed Facts Clarified at Oral Argument

The Court further clarified some additional disputed facts at oral argument. First, the government suggested for the first time its payment to Wright following Wright's delivery of 1 million Kimberly Clark masks was an "attempt at a settlement" related to a claim Wright filed for payment on Contract No. 0766, not a payment on Contract No. 0766 itself. *See* 3 Mar. 2026 Oral Argument Transcript ("Tr.") at 126:7–127:4, ECF No. 41. According to the government, once Wright and the government "settled"—by Wright supplying the Kimberly Clark masks and the government paying for those masks—then the contract termination was rescinded simply to remove the termination from Wright's record. *See id.* Curiously, this "settlement" was actually effected by the Contracting Officer's modification to the terminated contract. *See id.* ("THE COURT: Why was the contract modified if it was just a settlement? [THE GOVERNMENT]: I think that's just what the contracting officer and Wright agreed to do. . . . at Mr. Wright's deposition, . . . he testified that the settlement was the contract modification.")

Second, the Court clarified the requirement in Contract No. 0766 for the masks to be NIOSH-approved—on which the government relied to reject Biotech's masks—is not connected to any specific language in the contract itself. The government asserted "[t]he original contract did reference NIOSH approval because it attached the product specifications, which are technical requirements." Tr. at 56:7–10. At the end of the contract, the government attached a two-page technical brochure for the 3M 1860 mask, which does note the 3M mask features a "NIOSH approved N95 rating." *See* Gov't's App'x at 24 (3M Technical Data Sheet). Neither the form contract nor the attached schedule of supplies specifically references any requirements related to NIOSH approval, only explicitly requiring "N95 masks," with a parenthetical note, "(1860 TDS)." Pl.'s App'x at 4 (Contract No. 0766, Schedule of Supplies). The government confirmed the NIOSH requirement is not reflected anywhere else in the contract. *See* Tr. at 52:4–10 ("[THE COURT:] And then the contract, does it specify NIOSH? [THE GOVERNMENT]: It does in the product specs . . . that are attached. THE COURT: Just the 3M brochure? [THE GOVERNMENT]: That's right, to the product specs that reference NIOSH approval.").

Third, the Court clarified apparent miscommunication between Wright and the government regarding the substitution of Biotech's masks. When Wright first suggested replacing the unobtainable 3M masks with Biotech masks, the Contracting Officer asked Wright to confirm the masks were NIOSH approved. *See* Pl.'s App'x at 50–51 (26 June 2020 email correspondence between Contracting Officer and Mr. Wright). In response, Wright stated: "Pages 14-20 [of the Biotech product specifications] are the testing for NIOSH and all test[s] were met and approved from Nelson Labs for NIOSH. In addition, the FDA has a higher authority than NIOSH and has designated this mask as 'FDA Cleared for Surgical Use and Operation Room Environments'. This is the highest approval you can achieve through the FDA for the criteria within the CDC." *Id.* The Contracting Officer accepted this answer and asked Wright to move forward. *See id.* This exchange suggests Wright truthfully represented the Biotech mask's virtues, but omitted that the masks were not specifically NIOSH approved. *See id.* Wright would later extol the virtues of the Biotech masks again, asserting they were "superior" to the NIOSH-approved 3M masks. *See* Pl.'s App'x at 251, 431 (19 July 2020 Letter from Mr. Wright to Contracting Officer). Although plaintiff is not arguing, for purposes of this motion, the government should have accepted the Biotech masks to satisfy the contract, there is some conflict in the record as to whether the Biotech masks were actually superior to the NIOSH-approved masks required by the Contracting Officer. *See* Tr. at 38:8–16 (counsel for plaintiff describing Wright's written dispute letters claiming Biotech's masks outperform the 3M masks); Pl.'s App'x at 251, 431 (19 July 2020 Letter from Mr. Wright to Contracting Officer).

## V. Motion to Dismiss: Whether the Court has Subject Matter Jurisdiction Over Plaintiff's Claims Against Wright

The Court first determines whether it has subject matter jurisdiction over Counts III and IV against Wright. The government argues Wright is a private party and this court's jurisdiction is limited to money judgments against the United States. *See* Gov't's Mot. at 10–11. Plaintiff argues this court has jurisdiction "to render judgment upon any claim against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract," and thus the Court has jurisdiction over its contract claims against Wright. Pl.'s Resp. at 28 (citing 28 U.S.C. § 1491(a)(2)).

The Court's jurisdiction "is confined to the rendition of money judgments in suits brought for that relief against the United States, and if the relief sought is against others than the United States the suit as to them must be ignored as beyond the jurisdiction of the court." *United States v. Sherwood*, 312 U.S. 584, 588 (1941) (citations omitted). Wright is a private business registered in Texas. *See* Gov't's App'x at 259–61 (Wright Deposition). Plaintiff insists the Court has jurisdiction over its claims against Wright regardless under its authority "to render judgment upon any claim against, or dispute with, a contractor arising under [42 U.S.C. § 7104(b)(1)]." Am. Compl. ¶¶ 109, 122 (citing 28 U.S.C. § 1491(a)(2)). Section 7104, however, provides a "right of appeal from [a] decision by [a] contracting officer," not a freestanding cause of action on private contract disputes. 42 U.S.C. § 7104(b)(1) ("[I]n lieu of appealing the decision of a contracting officer under section 7103 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims."). At oral argument, plaintiff could not identify a single case where this court has entertained a claim by a subcontractor directly against the prime contractor. *See* Tr. at 77:20–24 ("THE COURT: Can you identify any similar case . . . where the Court of Federal Claims has permitted a contract claim by a private plaintiff against a private defendant? [PLAINTIFF]: I cannot."). Accordingly, given plaintiff's claims in counts III and IV against Wright are against a private defendant and not against the United States, they are "beyond the jurisdiction of the court" and must be dismissed. *Sherwood*, 312 U.S. at 588; RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").[1]

## VI. Motion to Dismiss: Whether the Government Waived the Assignment of Claims Act Requirements by Recognizing the Assignment to Biotech

The Court next determines whether the right to payment under Contract No. 0766 was validly assigned to plaintiff. At oral argument, plaintiff confirmed it was not arguing Biotech is a financing institution or that it complied with the strict requirements of the Anti-Assignment Act, and plaintiff is only arguing "that there was a waiver" of those requirements by the government. *See* Tr. at 84:4–15. Plaintiff argues the government waived the requirements of the Anti-Assignment Act when the Contracting Officer signed the notice and acknowledgement of assignment after being provided with all relevant information. *See* Pl.'s Resp. at 19. The government argues it never waived the Act because it did not modify the contract to reflect the assignment or make any payment to Biotech and was not informed of all relevant facts regarding the assignment. *See* Gov't's Mot. at 15–16. First, the Court examines the totality of the circumstances surrounding the assignment to determine whether the government waived the requirements of the Act. Second, the Court determines whether the government was fully appraised of all "highly relevant facts" related to the assignment.

[1] Plaintiff confirmed at oral argument its claims against Wright in this case are nearly identical to those it is currently pursuing in parallel litigation in Florida state court. *See* Tr. at 75:12–76:5. That litigation "is currently stayed" pending the determination of this court's jurisdiction over those claims. Tr. at 75:16–23. Given the Court's holding it lacks subject matter jurisdiction over plaintiff's claims against Wright, the state court litigation is now expected to proceed. *See id.*

A plaintiff "bear[s] the burden of establishing the court's jurisdiction by a preponderance of the evidence." *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016) (citing *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011)). "Generally, courts treat Anti-Assignment Act disputes under the typical Rule 12(b)(1) motion to dismiss framework." *Oxy USA Inc v. United States*, 163 Fed. Cl. 75, 86–87 (2023) (collecting cases); *see also Ins. Co. of the West v. United States*, 243 F.3d 1367, 1375 (Fed. Cir. 2001) ("We conclude that the Tucker Act must be read to waive sovereign immunity for assignees as well as those holding the original claim, except as barred by a statutory provision such as the Anti-Assignment Act."); *Steppe v. United States*, 945 F.2d 416 (Table), at *2 (Fed. Cir. 1991) (holding Anti-Assignment Act voided any assignment and assignee therefore "lacked standing" to sue the government). "Despite the bar of the Anti-Assignment statute . . . the Government, if it chooses to do so, may recognize an assignment." *Tuftco Corp. v. United States*, 614 F.2d 740, 745 (Ct. Cl. 1980) (citations omitted). To determine whether the government waived the protections of the Anti-Assignment Act, courts apply a "totality of the circumstances" test. *See id.* at 746 ("It is unnecessary to identify any one particular act as constituting recognition of the assignments by the Government. It is enough to say that the totality of the circumstances presented to the court establishes the Government's recognition of the assignments by its knowledge, assent, and action consistent with the terms of the assignments."). In *Tuftco* and subsequent cases, courts have looked to a variety of factors in making this determination, "including whether: (1) the assignor and/or the assignee sent notice of assignment to the Government; (2) the contracting officer signed the notice of assignment; (3) the contracting officer modified the contract according to the assignment; and (4) the Government sent payments to the assignee pursuant to the assignment." *Riviera Fin. Of Tex., Inc. v. United States*, 58 Fed. Cl. 528, 530–31 (2003) (summarizing the relevant factors in *Tuftco*, 614 F.2d at 745–46) (other citation omitted). "[T]hese factors are not meant to be exhaustive, and all need not be present in a given case." *Id.* "[W]here the Government's course of conduct, its statements to the parties and its dealings with the assignee indicate it acknowledges the assignee as the contractor, recognition has been found." *Tuftco*, 614 F.2d at 745 (citations omitted).

In *Tuftco*, the Federal Circuit's predecessor court (the Court of Claims) addressed a claim related to a Housing and Urban Development ("HUD") contract for the construction of mobile homes; the court addressed the government's recognition of assignments in a precedential panel opinion. *See Tuftco*, 614 F.2d at 741–42; *see also* Tr. at 86:14–17 (the government agreeing at oral argument *Tuftco* is "a binding Court of Claims case."). The prime contractor in *Tuftco*, Grant, engaged another company, Winchester, to build the homes and, after discussing the arrangement with the contracting officer, assigned the proceeds of the contract to the second company. *See id.* at 742. Before the assignment was made, both contractors contacted the contracting officer, who advised them "despite the Anti-Assignment Act, if Winchester would assume Grant's obligations HUD would make all payments directly to Winchester . . . instead of directly to Grant." *Id.* The prime contractor sent a notice of assignment to the contracting officer, who wrote at the bottom of the letter "assignment acknowledged." *See id.* Despite the notice and contracting officer's written notes, the government sent some payments directly to Winchester, and others to Grant, and later insisted it did not actually "recognize or acknowledge the assignments." *See id.* at 743. The Court of Claims held the government had validly recognized the assignment because of the contracting officer's notice and assent to the arrangement, stating "[g]iven the earlier contact Winchester and Grant had with [the contracting

officer] and the advice he gave, it is difficult to see how [the contracting officer's] signed acknowledgement was anything other than assent to the arrangement." *Id.* at 746. The court further held "[a]ny doubts on this score are dispelled by the Government's actions consistent with its demonstrated awareness and acknowledgement of the assignments," including partial payment to Winchester and acceptance of Winchester's mobile homes. *Id.*

### A. Whether the Totality of the Circumstances Support the Government's Recognition of an Assignment to Plaintiff

Plaintiff argues the government recognized the assignment when the Contracting Officer signed the notice and acknowledgment of assignment form. *See* Pl.'s Resp. at 19. Wright emailed the Contracting Officer a letter on 9 July 2020 which notified the government of the assignment and supplied the assignment agreement it had made with Biotech. *See* Pl.'s App'x at 199 (Notice and Acknowledgement of Assignment), 246 (9 July 2020 email from Mr. Wright to Contracting Officer). The Contracting Officer requested Wright and Biotech revise the notice before she could sign it to specify exactly what amounts were to be paid to which party and, after her request was granted, signed the notice on a line marked "acknowledged and agreed." *See id.* at 200 (Notice and Acknowledgement of Assignment, signature page), 241–43 (9 July 2020 – 10 July 2020 email correspondence between Contracting Officer and Mr. Wright). These undisputed facts satisfy two factors critical to the court's analysis in *Tuftco*: notice to the government and the contracting officer's signature on that notice. *See Tuftco*, 614 F.2d at 746. Just as in *Tuftco*, "given the earlier contact" Wright and Biotech had with the Contracting Officer "and the advice [s]he gave, it is difficult to see how [the Contracting Officer's] signed acknowledgement was anything other than assent to the arrangement." *Id.* The Contracting Officer's knowledge of the assignment, specific requests for revisions to the notice, and signature marked "acknowledged and agreed" all strongly suggest the government knowingly recognized the assignment to plaintiff. *See id.*

Although the government agreed at oral argument the first two factors in *Tuftco* are met here, *see* Tr. at 91:12–19, it argues, because the third and fourth factors—acceptance of the goods and payment to the assignee—are missing, the Court should find there was no recognition of an assignment. *See* Gov't's Mot. at 14–15. The government asserts *Tuftco* examined both of these factors even after noting the government signed an acknowledgement of the assignment, and the court stated the payment to the assignee was "perhaps most significant[]," so the absence of these factors here shows there was no assignment. *See id.* (quoting *Tuftco*, 614 F.2d at 746). The government's appeal to the analysis in *Tuftco* fails for two reasons. First, when *Tuftco* examined the third and fourth factors, it introduced them stating "[a]ny doubts [as to recognition of the assignment based on the first two factors] are dispelled by the Government's actions consistent with" the assignment. *Tuftco*, 614 F.2d at 746. The case did not hold an assignment cannot be recognized without these additional factors, which would be contrary to the totality of the circumstances test the case sets forth. *See id.* Second, while it is true the Court of Claims stated "[p]erhaps most significantly" the government there paid the assignee some payments and such payments constitute strong evidence of the government's assent to the assignment, *see id.*, the government has not identified any case holding this *factor* is a *necessary condition* to find recognition. To be sure, "[p]laintiff's case might have been enhanced had it demonstrated as extensive a course of dealing between the Government and the assignee," but the totality of the

circumstances here sufficiently favor plaintiff to find a satisfactory showing of recognition to survive the government's Motion to Dismiss. *Tuftco*, 614 F.2d at 746.

The government next argues "no one particular act" can constitute assignment—relying on *Tuftco*—and notice and acknowledgement of the assignment "is *not* enough to recognize the assignment"—relying on *Riviera Finance*. *See* Gov't's Reply at 6 (cleaned up) (government's emphasis). The government thus asserts the Contracting Officer's knowledge and signature on the notice of assignment could not constitute recognition or waiver of the Anti-Assignment Act as a matter of law. *See id.* In *Tuftco*, the Court of Claims held "[i]t is *unnecessary* to identify any one particular act as constituting recognition." 614 F.2d at 746 (emphasis added). Stating a court need not identify a single act as constituting recognition in a *totality of the circumstances* test is not the same as holding no one act could *ever* constitute a recognition. *See id.* The court in *Tuftco* held the test for recognition is whether the government's "knowledge, assent, and action consistent with the terms of the assignments," taken together, demonstrate the government's acceptance of the assignment arrangement. *See Tuftco*, 614 F.2d at 746. Further, even if it is accepted one act is insufficient for recognition, the Contracting Officer received notice of the assignment, and *then* advised Wright and plaintiff on what information she needed to accept the assignment, and *then* signed the notice of assignment. *See* Section IV.A, *supra*. This *set* of events and actions support recognition. *See Tuftco*, 614 F.2d at 746. Similarly, in *Riviera Finance*, this court held the contracting officer's "signing and returning" of a letter noticing an assignment "is a factor that weighs against the Government *even if, for purposes of summary judgment*, it is taken that the signed confirmation letter on its own is not enough to recognize the assignment." *Riviera Finance*, 58 Fed. Cl. at 532 (emphasis added). In other words, this court confirmed the notice and signature weighs against the government *regardless* of whether it was alone sufficient; it did not make a holding stating it is insufficient as a matter of law. *See id.* Accordingly, neither *Tuftco* nor *Riviera Finance* support the strict binary requirements[2] advanced by the government here. *See Tuftco*, 614 F.2d at 746; *Oxy USA*, 163 Fed. Cl. at 86–87 (collecting cases evaluating Anti-Assignment Act arguments under 12(b)(1) framework).

### B. Whether the Government was Sufficiently Notified of All "Highly Relevant Facts"

The government also argues under *American National Bank* the government could not have recognized the assignment because it lacked "knowledge of all the highly material facts," *i.e.* that plaintiff's masks were not NIOSH approved. *See* Gov't's Reply at 7 (citing *Am. Nat'l Bank & Trust Co. v. United States*, 22 Cl. Ct. 7 (1990); *Am. Nat'l Bank & Trust Co. v. United States*, 23 Cl. Ct. 542 (1991)). In *American National Bank*, this court held the government could not validly recognize an assignment where a contractor "effectively hid from [the government] the true nature of the financing agreement" because the contractor had assigned the contract

[2] The Court notes the government's insistence on a strict inquiry into the waiver question is remarkable given the substantial informality of the entire process of contract solicitation and modification on the government's part in this case. *See e.g.*, Gov't's App'x at 305–06 (Solicitation Email); Gov't's App'x at 1–2 (Standard Form 1449 contract award to Wright) (missing solicitation, requisition, and order numbers and most solicitation information); Pl.'s App'x at 50 (26 June 2020 email from Contracting Officer to Mr. Wright) (agreeing to accept different masks via email and without a contract modification).

payments to various other entities without informing the government of the complex arrangement. *See Am. Nat'l Bank*, 22 Cl. Ct. at 17–18. The court explained the Anti-Assignment Act is "designed to protect the Government from secret assignment arrangements, to prevent possible multiple claims and to make unnecessary the investigation of alleged assignments." *Id.* at 18 (citations omitted). This case differs from *American National Bank* because the Contracting Officer was fully aware of the nature of the assignment arrangement between Wright and plaintiff; the contractors attached a copy of the assignment agreement to the notice the government signed. *See* Section VI.A, *supra*. The concern in *American National Bank* related to a complex undisclosed arrangement where multiple companies would take a slice of contract payments, creating a "secret assignment arrangement" that risked "possible multiple claims," which is precisely what the Anti-Assignment Act forbids. *See* 22 Cl. Ct. at 18. No such concern is present here, as the only assignment arrangement was disclosed to the government in the notice. *See* Sections IV.A, VI.A, *supra*. The government insists it nevertheless lacked "all the highly relevant facts" because it was unaware the Biotech masks were not NIOSH-approved, but the government was unable to cite any case where confusion over the items to be supplied constituted a "highly relevant fact" which could defeat recognition of an assignment. *See* Tr. at 117:1–7 ("THE COURT: Can you point to any case [for] the notion that an idea of confusion about items to satisfy the contract would be considered a highly relevant, highly material fact? [THE GOVERNMENT]: The best I can do is the *American National* case."). While failure to disclose the full scope of an assignment arrangement sensibly can defeat the government's recognition of the assignment, mere confusion over the items to be supplied in this case does not deprive the government of the "highly relevant facts" necessary to recognize an assignment. *See Am. Nat. Bank*, 22 Cl. Ct. at 17–18 ("The Act is designed to protect the Government from secret assignment arrangements").

Looking at the totality of the circumstances surrounding Wright's assignment to plaintiff, including the notice to the Contracting Officer, the attachment of the assignment agreement to the notice, the Contracting Officer's requests for revisions to the notice before signing, and the Contracting Officer's signature on the revised notice marked "acknowledged and agreed," the facts currently presented to the Court suggest the government did recognize the assignment and waived the requirements of the Anti-Assignment Act. *See* Section VI.A, *supra*. To grant the government's motion to dismiss, the Court would be forced to hold the government's signed acknowledgment and agreement to the assignment arrangement is insufficient as a matter of law to support recognition. *See id.* As stated in Section VI.A *supra*, no case supports such a strict inquiry in the totality of the circumstances test that applies here, and it would be profoundly strange for the rule to state the government's written agreement to an assignment can never be sufficient to find it recognized the assignment. *See id.* At this preliminary stage, without the benefit of discovery, plaintiff has presented sufficient evidence to show a valid assignment and thus demonstrate the Court's jurisdiction over its claims against the government. *See id.* Consistent with its ongoing obligation to ensure subject matter jurisdiction exists, the Court leaves open the possibility the parties, after the benefit of discovery, may revisit the issue of recognition if new facts come to light which demonstrate the government did not recognize the assignment. *See* RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). Accordingly, the Court denies the government's Motion to Dismiss for lack of subject matter jurisdiction. *See Tuftco*, 614 F.2d at

746; *Oxy USA*, 163 Fed. Cl. at 86–87 (collecting cases evaluating Anti-Assignment Act arguments under 12(b)(1) framework).

## VII. Motion for Summary Judgment: Whether Disputed Facts Exist Regarding Plaintiff's Entitlement to Payment from the Government on Contract No. 0766

The Court next determines whether the government is entitled to summary judgment on Counts I ("wrongful payment to a third party in violation of the assignment of claims act") and II ("breach of third party beneficiary contract"). *See* Am. Compl. at 12, 16 (listing counts against the government). The government argues because the masks plaintiff supplied were not NIOSH-approved and were rejected, plaintiff cannot establish any entitlement to payment by the government. *See* Gov't's Mot. at 17. Plaintiff argues, because Wright ultimately performed on Contract No. 0766—with the proceeds assigned to plaintiff—using Kimberly Clark masks, plaintiff is entitled to receive the payment regardless of whether plaintiff's masks were used to satisfy the contract. *See* Pl.'s Resp. at 24–25. For purposes of the government's Motion for Summary Judgment, the Court assumes there was a valid assignment of the contract proceeds to Biotech. *See* Tr. at 6:13–16 ("THE COURT: Does the summary judgment portion of the motion assume that there was a valid assignment to Biotech? [THE GOVERNMENT]: That's right.").

The government first argues plaintiff's right to payment as assignee "when the assignee provides goods is premised on the *assignee's* goods having been 'accepted by' the Government under the contract at issue." Gov't's Reply at 14 (quoting *Tuftco Corp. v. United States*, 614 F.2d 740, 746 (Ct. Cl. 1980) (emphasis in original). The government cites two cases to support this rule: *Tuftco*, 641 F.2d 740, and *Produce Factors Corp. v. United States*, 467 F.2d 1343 (Ct. Cl. 1972). *See id.* at 14–15. At oral argument, the government insisted *Tuftco* supports conditioning an assignee's payment on its own goods being accepted to fulfill the contract because, in that case, the court noted the mobile homes ordered by the contract were accepted by the government. *See* Tr. at 137:17–138:14. The government then suggested such a condition is "implicit in the fact that the court gave great weight to the fact that the good had actually been accepted." Tr. at 138:10–14. Although the government is correct the court in *Tuftco* placed great weight on that fact, the weight applied only to the court's analysis of whether the government recognized an assignment:

> Given the earlier contact Winchester and Grant had with Scroggs and the advice he gave, it is difficult to see how Scroggs' signed acknowledgement was anything other than *assent to the arrangement. Any doubts on this score are dispelled* by the Government's actions consistent with its demonstrated awareness and acknowledgement of the assignments. The mobile homes were manufactured and *delivered to HUD by Winchester and accepted by HUD.*

*Tuftco*, 614 F.2d at 746 (emphasis added). Nowhere in the *Tuftco* opinion did the court condition the assignee's right to payment on its own goods satisfying the contract; the entire opinion examines only whether the government could (and did) recognize the assignment to the assignee. *See generally id.* Similarly, the government asserts *Produce Factors* supports this rule because it holds "[a]n 'assignee's rights to payments of contract proceeds are entirely dependent upon, and inseparable from, performance by the contractor of his contractual obligations.'" Gov't's Reply

at 13 (quoting *Produce Factors*, 467 F.2d at 1348). While it is true an assignee's right to payment on a contract is dependent on the contract being satisfied—thus triggering the government's obligation to pay—it does not then follow an assignee providing goods is only ever entitled to payment if a contractor performs *using their goods*. *Produce Factors*, 467 F.2d at 1348 (holding "assignee's rights to payments of contract proceeds are entirely dependent upon, and inseparable from, *performance* by the contractor of his contractual obligations" (emphasis added)); *see also id.* at 1349 ("When the Government receives notice that an assignment of proceeds under a Government contract has been made, it can no longer discharge its payment obligation under the contract by paying the contractor."). To be sure, in a typical case, an assignee who provides nonconforming goods may lose their entitlement to payment because, having procured nonconforming goods, the prime contractor never satisfies the contract. *See id.* at 1349 ("the assignee's rights are subject to, *inter alia*, defenses arising under the contract which the Government could have asserted against the contractor absent the assignment, such as nonperformance or failure of consideration."). Nothing in the cases the government cites, however, establishes a special rule barring an assignee from recovering contract proceeds unless the specific goods supplied by the assignee are used to satisfy the contract. *See Produce Factors*, 467 F.2d at 1348; *Tuftco*, 614 F.2d at 746.

Plaintiff argues it is entitled to payment on Contract No. 0766 because the Contracting Officer executed a valid assignment to plaintiff and "[t]he prime contractor thereafter fully performed," thus entitling plaintiff to payment. *See* Pl.'s Resp. at 24–25. At oral argument—though not in the briefs—the government asserted the government's payment to Wright following its supply of Kimberly Clark masks was not a payment on the contract which may have been assigned to plaintiff, but an "attempt at settlement . . . trying to settle the termination." Tr. at 126:15–16. According to the government, "the termination of the [Wright/Biotech] contract was effected August 5th, 2020," and "[a]s of that date," "no work had been performed." Tr. at 128:6–13. The government further contends, in "the ensuing months, there [was] a process to try to settle that termination, but that termination wasn't rescinded until late January of the following year, by which time Wright had already performed under the contract modification that required Kimberly Clark masks, and payment had been made pursuant to the modification, which listed Wright as the payee." Tr. at 128:14–21. Thus, the government argues no payment should have been directed to Biotech because the Biotech contract was first terminated but later modified pursuant to a settlement to cut Biotech out of the contract; the government asserts Wright performed pursuant to this new settlement agreement with delivery of Kimberly Clark masks and the government properly paid Wright. *See id.*

An "assignee's rights to payments of contract proceeds are entirely dependent upon, and inseparable from, performance by the contractor of his contractual obligations" and, after a contractor performs, "the assignee is entitled to all amounts earned by the contractor's performance." *Produce Factors*, 467 F.2d at 1348–49. Against the backdrop of these undisputed facts, the government's new settlement argument introduces a critical factual dispute between the parties: whether the government's payment to Wright satisfied the contract validly assigned to plaintiff, or instead constituted a separate settlement agreement with Wright to dispel Wright's claim against the government. If the payment was satisfaction of the contract, plaintiff may have been entitled to the proceeds sent to Wright based on the assignment of contract proceeds to plaintiff. *See Produce Factors Corp.*, 467 F.2d at 1349 ("the assignee is entitled to

all amounts earned by the contractor's performance"). If the payment was only a separate settlement of Wright's claim, however, plaintiff would have no recovery because the delivery and payment for Kimberly Clark masks relate to a different contract than the one assigned to plaintiff. *Id.* at 1348 ("contract proceeds are entirely dependent upon, and inseparable from, performance by the contractor of his contractual obligations").

While the government argues it properly paid Wright (and not Biotech) for Kimberly Clark masks, the government's argument is factual and faces several evidentiary hurdles. First, there is nothing in the record which specifies the payment to Wright was a settlement and not payment on the Contract, which, for purposes of summary judgment, the Court assumes was validly assigned to plaintiff. *See* Tr. at 6:13–16 ("THE COURT: Does the summary judgment portion of the motion assume that there was a valid assignment to Biotech? [THE GOVERNMENT]: That's right."). The government provides no documentation of a settlement agreement beyond modifications to the original contract. *See* Tr. at 68:15–19 ("Wright and Ms. Thomas engaged in a series of discussions to try to settle the termination. And as part of that settlement, that's how they ended up with the contract modification where BOP would accept the Kimberly Clark masks that were NIOSH-approved."). In November 2020—while Contract No. 0766 was purportedly terminated—the government issued a *contract modification* for Wright to "pick up the unapproved [Biotech] masks and replace them with the approved ALTERNATIVE NIOSH Kimberly Clark . . . masks." *See* Pl.'s App'x at 591 (10 Nov. 2020 Modification to Contract No. 0766, Modification No. P00001). Indeed, both the 5 August 2020 modification terminating the Biotech contract and the 10 November 2020 modification substituting Kimberly Clark masks share the same contract number and modification number. *Compare* Pl.'s App'x at 499 (5 Aug. 2020 Termination of Contract No. 0766, Modification No. P00001) *with id.* at 591 (10 Nov. 2020 Modification to Contract No. 0766, Modification No. P00001). After Wright picked up the Biotech masks and replaced them with the Kimberly Clark masks, the government paid Wright the exact amount specified in Contract No. 0766. *See* Pl.'s App'x at 707 (20 Jan. 2021 email from Mr. Wright to Contracting Officer) (confirming "full payment"). Thus, despite the government's contentions delivery and payment for Kimberly Clark masks was part of a separate agreement not involving Biotech, the record indicates such performance concerned the exact same, albeit modified, contract. *See id.*

Second, it is undisputed plaintiff delivered its masks to the government according to the assignment agreement it signed with Wright. *See* Section IV, *supra*. Although the government asserted at oral argument it was barred by an OSHA regulation from accepting non-NIOSH-approved masks, *see* Tr. at 36:23–37:1, it did not dispute the BOP accepted 15,000 Biotech masks under another contract requiring the same 3M technical specification near the time of the contract at issue, *see* Tr. at 62:24–63:11. This partial acceptance contradicts the government's contention it was within its rights to reject plaintiff's masks for nonperformance and instead direct payment to Wright after receipt of separate conforming goods. *Accord Produce Factors Corp.*, 467 F.2d at 1349 ("the assignee's rights are subject to, *inter alia*, defenses arising under the contract which the Government could have asserted against the contractor absent the assignment, such as nonperformance"). The government had no explanation for why 15,000 identical Biotech masks were accepted notwithstanding the regulation it now asserts bars their acceptance, *see* Tr. at 63:2–11, and the only support for the existence of such a regulation is an undated memorandum from the BOP which cites no

regulations or statutes, *see* Tr. at 36:23–37:1; Pl.'s App'x at 508 (U.S. Dep't of Justice, BOP, Memo. for LaShundra D. Thomas, Contracting Officer, Field Acquisitions Office, Subject: Alternate masks offered by Wright Consultants & Associates, LLC). The government agreed at oral argument it "cannot satisfy a payment obligation" to an assignee by "paying the original contractor," *see* Tr. at 120:22–121:10, yet the government has failed to demonstrate undisputed facts establishing its payment to Wright was pursuant to anything other than the original contract post-modification (the proceeds of which, for purposes of summary judgment, the Court assumes were validly assigned to plaintiff, *see* Tr. at 6:13–16, *see supra*.

As noted, *supra*, the issue of whether the government properly paid Wright comes down to whether the government paid Wright pursuant to the original contract or pursuant to a new settlement agreement. *See Produce Factors Corp.*, 467 F.2d at 1348–49. As the review of the record demonstrates, *supra*, several genuine disputes of material fact prevent the Court from concluding the government paid Wright pursuant to a new settlement agreement and not a modified version of the original contract. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (noting courts must draw all inferences at the summary judgment stage "in the light most favorable to the party opposing the motion" (citation omitted)). Drawing all inferences in favor of plaintiff, a genuine dispute of material fact exists as to the character of the government's payment to Wright, and this dispute is critical to the ultimate question of whether the payment should have been sent to plaintiff instead of Wright. *See Produce Factors Corp.*, 467 F.2d at 1349 ("the assignee is entitled to all amounts earned by the contractor's performance"); *Matsushita*, 475 U.S. at 587–88. Accordingly, this genuine dispute of material fact precludes the Court from granting summary judgment to the government and the Court denies the government's motion for summary judgment. *See id.*

## VIII. Conclusion

For the foregoing reasons, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the government's combined Motion to Dismiss and Motion for Summary Judgment, ECF No. 29. Plaintiff's claims against Wright are hereby **DISMISSED** without prejudice. Pursuant to RCFC 12(a)(4), the government **SHALL** answer the non-dismissed portions of plaintiff's complaint within 14 days of this order, on or before **9 September 2026**.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge